# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

DEITRICH IRVING                                          CIVIL ACTION

VERSUS                                                   NO. 18-932-SDD-EWD

GEORGIA-PACIFIC CORPORATION,
GEORGIA PACIFIC, LLC, GEORGIA-PACIFIC
HOLDINGS, LLC, KOCH INDUSTRIES, INC.,
AND KELVIN HILL

## RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by

Defendant, Georgia Pacific Consumer Operations, LLC ("Defendant" or "GP").  Plaintiff,

Deitrich Irving ("Plaintiff") has filed an *Opposition*[2] to this motion, to which Defendant filed

a *Reply*.[3]  For the reasons that follow, Defendant's motion shall be granted.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Before setting forth the specific facts at issue in this case, the Court notes that

Local Rule 56(f) provides:

> Facts contained in a supporting or opposing statement of material facts, if
> supported by record citations as required by this rule, shall be deemed
> admitted unless properly controverted. An assertion of fact set forth in a
> statement of material facts shall be followed by a citation to the specific
> page or paragraph of identified record material supporting the assertion.
> The court may disregard any statement of fact not supported by a specific
> citation to record material properly considered on summary judgment. The
> court shall have no independent duty to search or consider any part of the
> record not specifically referenced in the parties' separate statement of facts.

---

[1] Rec. Doc. No. 54.
[2] Rec. Doc. No. 55.
[3] Rec. Doc. No. 59.
50547

Further, Local Rule 56 (c) and (f) requires an opposing party to:

> submit with its opposition a separate, short, and concise statement of material facts. **The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation.** The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule.[4]

Although Plaintiff submitted his own *Statement of Undisputed Material Facts*,[5] he failed to comply with the Local Rules and admit, deny, or qualify the undisputed facts offered by Defendant. According to the rules, the uncontroverted facts offered by Defendant are thus deemed admitted by this Court for purposes of this motion. However, another section of this Court explained in *Braud v. Wal-Mart Stores, Inc.* that "case law recognizes that the Court can still consider record evidence to determine if there is a factual dispute."[6] To the extent Plaintiff has directed the Court to specific, countervailing summary judgment evidence demonstrating genuine disputes of material fact in this matter, the Court will consider same. Therefore, the following facts are deemed admitted as uncontroverted, unless otherwise indicated.

---

[4] Emphasis added.

[5] Rec. Doc. No. 55-1.

[6] 2019 WL 3364320 at *4 (M.D. La. July 25, 2019)(citing *Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998)(holding, where plaintiff failed to oppose the motion for summary judgment, that facts in "Statement of Undisputed Facts" were admitted, "except to the extent that the 'facts' in the 'Statement of Undisputed Facts' are contradicted by 'facts' in other materials attached to his motion for summary judgment." (citation omitted)); *Porter v. Dauthier*, No. 14-41, 2015 WL 5611647, at *8, *13 (M.D. La. Sept. 23, 2015) (deGravelles, J.) (relying on *Smith* and holding, when Plaintiff's opposition left "no doubt about his disagreement with either the basis or import of each of Plaintiff's undisputed facts," that Plaintiff would have forty-eight hours from the issuance of the ruling to comply with the Local Rule, and ultimately denying the motion for summary judgment)).

50547

## II.    FACTUAL BACKGROUND

On June 27, 2016, Plaintiff, who is African-American, was hired as the Safety Leader/Manager of Safety and Health at GP's Port Hudson paper mill located in Zachary, Louisiana.[7]  Plaintiff was hired by Kelvin Hill ("Hill"), the Vice President of Port Hudson Operations and Port Hudson Mill Leader, who was Plaintiff's direct supervisor and is also African-American.[8]

All GP employees are expected to act in accordance with applicable laws and the Georgia-Pacific Code of Conduct ("COC"), which sets out the Company's ten Market-Based Management ("MBM") Guiding Principles.[9] Under this COC, GP employees are expected to treat each other with honesty, dignity, respect and sensitivity.[10]  Employees are also expected to abide by the MBM Challenge Process, in which GP employees who may have differing points of view share them with others in a respectful and non-confrontational way.[11]  In furtherance of promoting respect for others, the COC sets out the Company's commitment to providing a workplace free from violence, intimidation, and disruptive behavior.[12] Bullying, violence, threats, harassment, intimidation and other disruptive behavior, such as oral or written statements, gestures or expressions that communicate a direct or indirect threat of physical harm, are not tolerated.[13]

---

[7] Rec. Doc. No. 54-2, Irving Depo. at 61:2- 3, 62:5-18.
[8] Rec. Doc. No. 54-6, Hill Depo. at 8:6-8,
 9:9-14; Rec. Doc. No. 54-7, Haynes Depo. at 12:24-13:1; Rec. Doc. No. 54-2, Irving Depo. at 62:19-23.
[9] Rec. Doc. No. 54-2, Irving Depo. at 81:13-82:16, Ex. 6 at DEF 52; Rec. Doc. No. 54-7, Haynes Depo. at 9:22-10:6.
[10] Rec. Doc. No. 54-2, Irving Depo. at 85:3-11.
[11] *Id.* at 74:4-14, 84:5-14, Ex. 6 at DEF 56.
[12] *Id.* at Vol. 1, Ex. 6 at DEF 67.
[13] *Id.* at Vol. 1, 86:18-24, Ex. 6 at DEF 67.
50547

GP maintains that it does not tolerate unlawful discrimination and harassment, and specifically instructs employees to contact their immediate supervisor, any member of management, any local or corporate human resources leader, any compliance and ethics resource, any lawyer in the Legal Department, or the Guideline in the event they believe an employee has engaged in such unlawful conduct.[14]   The Guideline is a hotline managed by an independent third party through which GP employees can report their concerns, and they may do so anonymously.[15]   Retaliation against employees who report their concerns to GP is not tolerated.[16]

Plaintiff admitted that, upon his hire, he was notified about the COC, and he understood that he was: (1) required to exemplify and enforce the COC;[17] (2) subject to the COC; and (3) that compliance with the COC was a term of his employment.[18]   Further, as the Manager of Safety and Health, Plaintiff was expected to lead by example, which included being able to control his emotions in challenging settings.[19]  Plaintiff agreed that the importance of managers controlling their emotions was emphasized to him in training.[20]  Hill also implemented "ground rules" for managers when conducting meetings, such as respecting and listening to others, respectfully challenging ideas and not the person, and seeking to understand where others were coming from before trying to be understood.[21]

---

[14] *Id.* at Ex.6 at DEF 63; Rec. Doc. No. 54-7, Haynes Depo. at 29:5-12.
[15] Doc. No. 54-7, Haynes Depo. at 29:9-12, 40:11-25.
[16] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, Ex. 6 at DEF 64; Doc. No. 54-7, Haynes Depo. at 33:3-6.
[17] Rec. Doc. No. 54-2, Irving Depo. Vol. 2 at 127:6-16.
[18] *Id.* at Vol. 1, 62:24-63:11.
[19] *Id.* at Vol. 2, 36:17-23.
[20] *Id.* at Vol. 1, 150:10-18.
[21] *Id.* at Vol. 1, 151:15-25, 153:3-6.
50547

In accordance with his safety vision for the mill, Plaintiff chose to embed members of his team within the various departments in the mill, have them attend departmental meetings, and close out investigations related to safety matters; Hill was in favor of this approach.[22]  In fact, Hill was aligned with Plaintiff's safety vision for the mill, supported Plaintiff's staffing decisions,[23] and Plaintiff was given authority to hire the most qualified people for his team, which grew to ten employees.[24]

During the course of Plaintiff's employment at GP, Hill had coaching sessions with Plaintiff about his communication style and how he talked with employees in connection with some of his outbursts in staff meetings.[25]  Hill encouraged Plaintiff to find a style that allowed him to communicate without being disruptive.[26]  On one occasion, William Yeager ("Yeager"), the Senior HR Manager at the time, was told by the Training Manager that she was concerned about a meeting she had with Plaintiff during which he had raised his voice.[27] At the Training Manager's request, Yeager discussed the incident with Plaintiff, who stated that he was not angry at the Training Manager but was angry about the safety training program.[28]  Plaintiff indicated that he did not realize he had raised his voice that much and would make sure it did not happen again.[29]  Yeager expressly told Plaintiff not to do it again.[30]

---

[22] *Id.* at Vol. 1, 115:17-116:4.
[23] *Id.* at Vol. 2, 65:3-66:16, 67:13-22.
[24] *Id.* at Vol. 2, 66:17-25.
[25] Rec. Doc. No. 54-6, Hill Depo. at 26:4-21.
[26] *Id.*
[27] Rec. Doc. No. 54-5, Yeager Depo. at 24:23-25:3.
[28] *Id.* at 25:4-10.
[29] *Id.* at 25:11-13.
[30] *Id.* at 25:14-17.
50547

Another incident occurred in October 2017 when Craig Barfield ("Barfield"), an Optimizer in the Utilities Department, held an outage safety meeting with GP contractors.[31]  Jeremy Noble ("Noble"), Construction Management Safety Manager, asked Plaintiff to attend this meeting and provide his safety perspective on the outage.[32] Upon arriving at the meeting, Plaintiff testified that he said, "Craig is going through his spiel about how we had three incidents today and want to get everyone on the same page, talk about alignment."[33]  According to Plaintiff, Barfield then stated, "If someone from safety shows up to stop the damn job...give one of us a call," and Plaintiff interjected strongly and cut him off.[34]  Plaintiff acknowledged that he responded to Barfield in an elevated voice and that he was "pissed."[35]

After the meeting, Plaintiff asked Noble about the overall tone and his reflections on the meeting, and Noble responded that the meeting had gotten off to a rough start, but eventually, they got alignment.[36]  Plaintiff and Noble walked to the Safety Office, where Plaintiff observed Barfield saying, "I feel you're creating a hostile work environment" as he exited the office of Brandon Jones ("Jones"), a Safety Specialist and Plaintiff's direct report.[37] Barfield then requested that his supervisor, Vin Webster ("Webster"), come over.[38] Webster went to the Safety Department, and the five GP employees discussed how the safety meeting got off to a rough start and how they gained alignment and got

---

[31] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, 166:8-18; Rec. Doc. No. 54-3, Irving Depo. Vol. 2, 15:25-16:4.
[32] Rec. Doc. No. 54-3, Irving Depo. Vol. 2, 21:15-22:3.
[33] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, 169:12-14.
[34] *Id.* at 169:18-25.
[35] *Id.* at 144:5-15,171:1-7.
[36] *Id.* at 173:5-8
[37] Rec. Doc. No. 54-3, Irving Depo. Vol. 2, 29:3-8.
[38] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, 174:15-18.
50547

the meeting back on track.[39]  Plaintiff testified that he apologized to Barfield "if [he] came off as being a bit up in his business so to speak."[40]  Webster echoed Plaintiff's concerns regarding safe operating practices, and the group shook hands and left for the day.[41]

Despite this seemingly positive end to the meeting, Barfield subsequently reported to Webster that he felt bullied and threatened by Plaintiff and Jones in the Safety Department before Webster had arrived.[42]  Hill requested an investigation into the exchange so he could determine the facts of the case.[43]  Yeager reported the incident to the Guideline because Barfield's complaint involved accusations of bullying and threatening behavior.[44]  The Guideline call resulted in an incident report, and Yeager spoke with Janet Zeh ("Zeh"), the Manager of EEO and HR Compliance assigned to conduct the investigation and interview all employees involved.[45]

On October 29, 2017, Hill called Plaintiff and informed him that a complaint about him had been made through a Guideline call and an investigation was underway.[46]  The investigation revealed that some employees and contractors raised concerns about Plaintiff's and Jones' behavior during and after the outage meeting.[47]  Plaintiff was suspended with pay and sent home pending the outcome of the investigation.[48]

---

[39] *Id.* at 174:13-21.
[40] *Id.* at 174:22-23.
[41] *Id.* at 174:24-175:6.
[42] Rec. Doc. No. 54-6, Hill Depo. at 38:8-21; Rec. Doc. No. 54-5, Yeager Depo. at 21:19-22:1.
[43] Rec. Doc. No. 54-6, Hill Depo. at 39:3-5.
[44] Rec. Doc. No. 54-5, Yeager Depo. at 19:12-16.
[45] *Id.* at 22:2-14; Rec. Doc. No. 54-9, Zeh Decl. ¶¶ 4-5.
[46] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, 175:7- 11.
[47] Rec. Doc. No. 54-3, Irving Depo. Vol. 2, 49:7-12.
[48] *Id.* at 24:2-4; Rec. Doc. No. 54-9, Zeh Decl. ¶ 7.
50547

At the time Yeager was notified of Barfield's complaint against Plaintiff and Jones, Yeager had already been conducting a separate investigation regarding an incident that occurred in the pulp mill one to two weeks earlier.[49]  Plaintiff had reported to the pulp mill because a forklift caught fire, and reports of an altercation between Plaintiff and the employees at the pulp mill dock were made.[50] Plaintiff was also accused of hitting or grabbing the pulp mill supervisor's arm during this incident.[51] Yeager concluded that Plaintiff yelled at the other employees and used profanity, which was unacceptable for a member of leadership,[52] but Yeager was unable to confirm whether Plaintiff hit or grabbed the pulp mill supervisor's arm.[53]  After the pulp mill incident, Plaintiff was counseled to review the challenge process, and he did.[54]

In connection with Barfield's complaint that Plaintiff and Jones had engaged in bullying and threatening behavior, Zeh interviewed Plaintiff, Jones, Barfield, Webster, and Noble.[55]  During Webster's October 23, 2017 interview, Webster advised Zeh that, when he arrived at the Safety Department on the date of the incident, tensions were high, and initially, Plaintiff and Jones would not talk to him.[56]  Webster told Zeh that, after he introduced himself, Plaintiff stated that Barfield made them look "stupid" in front of the contractors.[57]  Webster reported that, during the discussion, Plaintiff raised his voice, and

---

[49] Rec. Doc. No. 54-3, Irving Depo. Vol. 2, 50:13-21, 51:2-13.
[50] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, 69:17-19; Rec. Doc. No. 54-6, Hill Depo. at 37:2-11; Rec. Doc. No. 54-5, Yeager Depo. at 20:24-21:12.
[51] Rec. Doc. No. 54-5, Yeager Depo. at 21:8-10.
[52] *Id.* at 21:13-15, 27:16-22.
[53] *Id.* at 21:15-16.
[54] Rec. Doc. No. 54-2, Irving Depo. Vol. 1, 72:14-19, 74:15-22.
[55] Rec. Doc. No. 54-9, Zeh Decl. ¶¶ 4- 12.
[56] *Id.* at Ex. A at DEF 874.
[57] *Id.*

50547

Webster pushed back, saying "Look guys, we are just getting loud, not solving a problem."[58]  Webster also told Zeh that, on the way back to his office, Barfield told him about the earlier interaction with Plaintiff and Jones, and Barfield advised Webster that he felt cornered by them,  that Jones had his finger an inch from his face, and that Plaintiff was lunging at him.[59]

Zeh interviewed Barfield on October 23, 2017, and he told Zeh that, following the safety meeting, Jones told him that he had been disrespectful to the Safety Department and put his finger in his face.[60]  Barfield also told Zeh that he asked Noble if Noble thought he had been disrespectful, and Plaintiff, who appeared agitated, stopped and said that he was "passionate," that he had gotten "passionate" a few days earlier, and was going to get "passionate" then.[61]  Barfield told Zeh that he felt Plaintiff's and Jones' body language was intense; that Jones was standing close to him and making gestures close to his face; that Plaintiff would step towards him and then step away; and ultimately, that he was concerned that people would not come to the Safety Department because Plaintiff and Jones were so aggressive and confrontational.[62]

On October 23, 2017, Zeh interviewed Noble.[63]  Noble reported that he had attended the safety meeting, and Barfield asked him to stay due to Plaintiff's and Jones' behavior.[64]  Noble stated that Jones kept leaning towards Barfield and asking if he was

---

[58] *Id.*
[59] *Id.*
[60] *Id.* at ¶ 9, Ex. A at DEF 873.
[61] *Id.*
[62] *Id.*
[63] *Id.* at ¶ 10, Ex. A at DEF 872.
[64] *Id.*

50547

why Barfield was shaking and if Barfield was scared.[65] Noble reported that he observed
Barfield trembling, and Barfield appeared to feel threatened, but he remained calm and
did not raise his voice.[66] Noble stated he felt as if he was going to have to break up a
fight.[67]  Noble advised that Barfield said he wanted to get his supervisor involved, and
Plaintiff and Jones laughed; Plaintiff then made a comment about being "passionate."[68]
Noble expressed that that he was embarrassed by this, and he had previously observed
Jones engaging in inappropriate behavior.[69] Noble also told Zeh that he had tried to
address Jones' behavior with Plaintiff, but it fell on deaf ears.[70]

Jones was interviewed by Zeh on October 24, 2017, and he told Zeh that Plaintiff
was "passionate about his job and it came across that way."[71]  The next day, Zeh
interviewed Plaintiff.[72]  Plaintiff told Zeh that he felt "disrespected" at the outage
meeting.[73]  Plaintiff acknowledged that he was passionate about his job and, at times, he
may come across as emotional.[74]  Plaintiff also acknowledged that his voice during the
outage meeting may have been "elevated."[75]  Zeh noted that Plaintiff's demeanor during
the interview was curt, short, and standoffish.[76]

---

[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.* at ¶ 11, Ex. A at DEF 872.
[72] *Id.* at ¶ 12, Ex. A at DEF 871.
[73] Rec. Doc. No. 54-3, Irving Depo. Vol. 2, 49:13-17.
[74] *Id.* at 27:5-25.
[75] *Id.* at 27:12-16.
[76] Rec. Doc. No. 54-9, Zeh Decl. at Ex. A at DEF 871.
50547

At Plaintiffs request, on November 8, 2017, Zeh interviewed Evan Burke ("Burke"), one of Plaintiff's direct reports.  Burke's interview was consistent with the previous reports by other GP employees that there had been a heated discussion between Plaintiff, Jones, and Barfield in the Safety Office.[77]  Also during this investigation, Webster provided Zeh with four written statements from contractors and GP employees who had attended the outage meeting and expressed concern about Plaintiff's interaction with Barfield.[78]  Yeager also submitted his investigation notes regarding the earlier pulp mill incident to Zeh.[79]  Based on the interviews and documents obtained during the investigation, Zeh concluded that Plaintiff and Jones had engaged in behavior inconsistent with the COC and recommended their terminations.[80]  At the conclusion of the investigation and Zeh's recommendations, Hill, Yeager, and their supervisors met to discuss the appropriate course of action.[81]

Hill concluded that Plaintiff had violated GP's Guiding Principles, and Plaintiff's behavior had created a hostile work environment inside the organization, tension between employees, and people did not feel safe coming to work and possibly having to encounter Plaintiff.[82]  Hill testified that contractors had expressed concern about not wanting to be alone with Plaintiff in a safety meeting, and one contractor refused to go to another safety meeting and asked for support from mill leadership regarding Plaintiff and his

---

[77] *Id.* at ¶ 16, Ex. A at DEF 870.
[78] *Id.* at ¶ 13, Ex. A.
[79] *Id.* at ¶ 14, Ex. A at DEF 146-164; Rec. Doc. No. 54-5, Yeager Depo. at 20:21-23.
[80] Rec. Doc. No. 54-9, Zeh Decl. at ¶ 15.
[81] Rec. Doc. No. 54-5, Yeager Depo. at 26:24-27:1.
[82] Rec. Doc. No. 54-6, Hill Depo. at 46:8-21.
50547

department's conduct.[83]  Both Hill and Yeager observed a pattern of Plaintiff becoming angry and confrontational in the workplace, including yelling, raising his voice, and using inappropriate language.[84] Thus, Plaintiff's employment was terminated because Plaintiff violated GP's Code of Conduct.[85]

Subsequently, Hill met with Plaintiff and advised that the investigators had concluded their investigation, and, based on the investigation findings, Plaintiff's employment was being terminated.[86]  Plaintiff was advised that the conclusion of GP's investigation was that Plaintiff behaved inappropriately and unprofessionally, and Plaintiff testified that he was told that this was the reason for his termination.[87]

Following his termination, Plaintiff filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964,[88] alleging racial discrimination and retaliation on the part of GP. [89]  GP now moves for summary judgment on all claims asserted by Plaintiff.

As set forth above, Plaintiff offered no responses or countervailing statements of disputed fact, or citation to supporting record evidence, regarding GP's proffered facts. Plaintiff contends that he was routinely referred to using racial slurs; however, the record citation does not support this statement; rather, this citation references Plaintiff's

---

[83] *Id.* at 47:10-19.
[84] *Id.* at 59:14-22; Rec. Doc. No. 54-5, Yeager Depo. at 24:6-25:3.
[85] Rec. Doc. No. 54-5, Yeager Depo. at 27:3-6, 34:17-24; Rec. Doc. No. 54-9, Zeh Decl. at ¶ 15, Ex. A at DEF 875.
[86] Rec. Doc. No. 54-3, Vol. 2 at 53:11-54:10.
[87] *Id.* at 54:25-55:14, 55:15-56:4.
[88]  42 U.S.C. § 2000e, *et seq.*
[89] GP also moves for summary judgment on a purported hostile work environment claim.  No such claim is asserted in Plaintiff's *Second Amended Complaint*, and Plaintiff did not address this purported claim in his *Opposition* to GP's *Motion for Summary Judgment.*  Thus, to the extent any hostile work environment claim was asserted in this matter, it is dismissed as abandoned.
50547

testimony regarding racial comments and behavior directed at co-workers.[90]  Plaintiff also

claims he complained about racial discrimination to Human Resources managers at GP.

The citation in support is Plaintiff's testimony that he only ever reported racial comments

to Hill, his direct supervisor.[91]  GP denies this statement and directs the Court to Yeager's

testimony that Plaintiff never reported to Yeager any complaints on his own behalf,

outside an issue with the training manager,[92] and Haynes' testimony that Plaintiff never

complained of discrimination to her.[93]

Plaintiff also claims that he had no history of disciplinary action prior to his

termination,[94] and that GP had no policies for discipline, termination, promotion, or

demotion of salaried employees.[95]  GP points to the facts and evidence presented above

to challenge these statements.

## III.    LAW AND ANALYSIS

### A.    Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion

if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment

as a matter of law.[96] This determination is made "in the light most favorable to the

opposing party."[97] A party moving for summary judgment "'must "demonstrate the

---

[90] Rec. Doc. No. 55-2, Irving Depo. Vol. 1 at 99:21-25, 100:1-4.

[91] *Id.* at 96: 5-8, 98:13-19.

[92] Rec. Doc. No. 59-3, Yeager Depo. at 13-14.

[93] Rec. Doc. No. 54-4, Haynes Depo. at 30:22 – 31:10.

[94] Rec. Doc. No. 54-4, Haynes Depo. at 51:6-8.

[95] Rec. Doc. No. 54-5, Yeager Depo. at 17:20-25.

[96] FED. R. CIV. P. 56(a).

[97] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).

50547

absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[98] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[99] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[100]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[101] All reasonable factual inferences are drawn in favor of the nonmoving party.[102] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[103] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[104]

---

[98] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

[99] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[100] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).

[101] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[102] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[103] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

[104] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).

50547

### B.    Title VII Race Discrimination - Pretext

To prove race discrimination under Title VII, Plaintiff must establish that he is (1) "a member of a protected group" (2) "was qualified for the position at issue" (3) "was discharged or suffered some adverse employment action by the employer"; and (4) "was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group."[105]  If Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the Defendant to articulate legitimate, non-discriminatory reasons for the adverse actions taken against Plaintiff.[106] If the Defendant satisfies this burden of production, the burden shifts back to Plaintiff, who must "offer sufficient evidence to create a genuine issue of material fact "either (1) that the Defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the Defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the Plaintiff's protected characteristic (mixed-motive[s] alternative)."[107]  Plaintiff proceeds in this case under the pretext alternative.

For purposes of this motion, GP does not dispute that Plaintiff has set forth a *prima facie* case of race discrimination,[108] and Plaintiff concedes that GP has presented a legitimate, nondiscriminatory reason for Plaintiff's termination.  Therefore, the only issue

---

[105] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

[106] *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

[107] *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citing same in the context of a Title VII race discrimination case).

[108] GP does challenge Plaintiff's ability to set forth a *prima facie* case regarding his suspension with pay, arguing that suspension with pay does not constitute an adverse employment action.  Rec. Doc. No. 54-1 at 15.  However, Plaintiff fails to oppose or address this claim entirely; thus, any purported claim distinct from termination based on Plaintiff's suspension with pay is dismissed as abandoned.

50547

before the Court on this claim is whether genuine disputes of material fact exist regarding evidence of pretext such that summary judgment in favor of GP is improper.

A plaintiff must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination."[109] "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."[110] "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."[111] Critically, "[w]hen conducting a pretext analysis, the court is not to engage in second-guessing an employer's business decisions.[112] Anti-discrimination laws do not require an employer to make proper decisions, only [non-discriminatory] ones."[113]

Plaintiff argues that the following constitute evidence of pretext: (1) the performance evaluation completed two months prior to Plaintiff's termination was "devoid of any complaints" regarding Plaintiff's communication style and was generally positive regarding Plaintiff's "open line of communication"; (2) Hill did not document Plaintiff's employment file with a performance issue or place Plaintiff on a performance improvement  plan; and (3) Plaintiff had reported to Hill and HR that he and his reports had been referred to with racial slurs and other racial discrimination.  For the reasons set forth below, the Court finds that Plaintiff has failed to carry his burden of presenting summary judgment evidence demonstrating material fact disputes regarding pretext.

---

[109] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015).

[110] *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010).

[111] *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017).

[112] *Culbert v. Cleco Corp.*, 926 F.Supp.2d 886, 894 (citing *LeMaire v. La. Dept. Of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir.2007)).

[113] *Id*. (citing *LeMaire*, 480 F.3d at 391 (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991))).

50547

### 1.   Failure to Rebut Legitimate, Nondiscriminatory Reasons

First, the Court finds that Plaintiff fails to carry his burden because he has failed to present evidence rebutting the nondiscriminatory reason offered by GP for his termination.   Indeed, Plaintiff's own testimony confirmed the conduct upon which his termination was based, and Plaintiff offered no countervailing evidence as to the Barfield incident or the pulp mill incident.   The Fifth Circuit requires that Plaintiff "must present evidence rebutting each of the nondiscriminatory reasons offered by the employer.[114] Further, "[w]here a plaintiff 'falls short of [his] burden of presenting evidence rebutting *each* of the legitimate, nondiscriminatory reasons produced by [the employer],' summary judgment is appropriate."[115]    Accordingly, Plaintiff's failure to present controverting evidence to rebut the facts establishing his performance problems renders summary judgment appropriate in favor of Defendant.

### 2.   Prior Performance Evaluation/Lack of Performance Improvement Plan

Plaintiff contends that his generally positive performance review, completed two months prior to his termination, and lacking in reference to any communication problems, is evidence that questions the veracity of GP's proffered reason.   There is no citation to this performance evaluation for the Court to review.   Moreover, as GP points out, the two incidents for which Plaintiff was terminated occurred in October 2017, *after* the completion of his September 2017 evaluation.   Thus, there can be no inference of pretext for GP

---

[114] *Williams v. Clegg's Nursery,* 2016 WL 3702978, at *9 (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).

[115] *Id.* (quoting *Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010) (emphasis in original)).

50547

failing to include incidents in Plaintiff's September 2017 performance evaluation that did not occur until October 2017.  The Court agrees.

Plaintiff also claims that Hill's failure to document the incidents giving rise to Plaintiff's termination in his employment file, or place Plaintiff on a performance improvement plan, is evidence of pretext.  Plaintiff offers a single record citation in support of these arguments, the deposition testimony of Hill.  However, Hill's testimony does not assist Plaintiff's claims:

> Q:    Did you ever place Mr. Irving on the performance improvement plan?
> A:    No.  We had several coaching conversations with – with Deitrich in an attempt to work with him and to work through our concerns.
> Q:    And when you didn't see the improvement that you were seeking, is there some reason you didn't put him on the performance improvement plan?
> A:    Well, again, I – I would say, you know, those – those things happen through time.  Deitrich was a new employee, and, you know, the approach that was taken was to – share expectations with him to be sure he understood kind of what was expected and what his role and – and expectations were, coach him up initially if there were things that – that needed to be adjusted.  I mean – that's the approach we took.[116]

Hill's testimony demonstrates that, while Plaintiff was not placed on a formal improvement plan, he and other supervisors engaged in informal coaching to address Plaintiff's performance issues.  Plaintiff offers no authority for the ostensible proposition that GP was required to place Plaintiff – or any employee – on a performance improvement plan or have such a policy in place.  The lack of a formal policy is not indicative of discriminatory animus.

---

[116] Rec. Doc. No. 55-4 at 31:2-17.

50547

Further, if such a policy existed, Plaintiff's burden is to demonstrate how such a policy was applied in racially disparate fashion.  As the Fifth Circuit explained:  "Although an 'employer's failure to follow its own policies may be probative of discriminatory intent,'[117] we require discharged employees in discrimination cases to show, in addition, that they were treated differently from non-minority employees.[118] We insist on this additional evidence because 'Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.'"[119]  Plaintiff herein did not argue or provide any evidence whatsoever that any formal or informal discipline policy was applied to Plaintiff differently than it was applied to similarly situated non-minority employees.  Thus, the failure to place Plaintiff on a formal performance improvement plan does not constitute evidence of pretext.

3.    Racial Comments – Stray Remarks

Plaintiff testified that he complained to Hill about himself and others in his department being referred to with racial slurs and rude behavior that Plaintiff attributed to race.  Plaintiff testified that Jones was routinely called "Boy," "Bubba," "Bub," and "Nigger," and was told that the safety crew was not needed at safety meetings.[120]  But Plaintiff also testified that he did not witness this behavior, he simply reported the allegation to HR.[121]  Plaintiff vacillated on whether he ever actually made a complaint to GP regarding racial slurs being used against him:

---

[117] *Hamilton v. AVPM Corp.*, 593 Fed. Appx. 314, 321 (quoting *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 336 (5th Cir.2005)).
[118] *Id.* (citing *e.g., Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir.2011)).
[119] *Id.* at 321-22 (quoting *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir.2003)).
[120] Rec. Doc. No. 55-2, Irving Depo. at 94:7-12.
[121] *Id.* at 94:17-19.
50547

Q:     Because you weren't involved in the complaints, correct?
A:     That's correct.
Q:     Okay.  You never made any complaints yourself about being called a racial name, did you?
A:     No, but I was grouped in a category, and that term came up that we were subhuman and that the one white guy that I hired …. He was told, You are just like the rest of those people.

* * *

Q:     You never made any complaints thereafter to anyone at Georgia-Pacific, did you?
A:     I captured it in my report to Kelvin Hill.
Q:     Is it your testimony that in your report to Kelvin Hill you put down incidents of race discrimination that occurred towards you?
A:     Challenges with my team and myself.

GP challenges this purported pretext evidence, arguing that Plaintiff has only presented evidence of stray remarks and has failed to identify any individual who made racial comments directly to him, much less any supervisory official involved in the decision to terminate him.

In *Patel v. Midland Memorial Hospital & Medical Center*,[122] the Fifth Circuit held that, under the "stray remarks" doctrine, a workplace slur does not provide sufficient evidence of discrimination unless it is related to the plaintiff's protected class, proximate in time to the adverse employment decision, made by an individual with authority over the plaintiff, and related to the employment decision at issue.[123]  The record evidence before the Court demonstrates that Plaintiff cannot rebut the stray remarks doctrine.  There is no evidence that any alleged comments were made proximate in time to Plaintiff's termination, no evidence that such comments were made by any individual with authority

---

[122] 298 F.3d 333 (5th Cir.2002), *cert. denied*, 537 U.S. 1108, 123 S.Ct. 885, 154 L.Ed.2d 780 (2003).
[123] *Id*. at 344.
50547

over Plaintiff – indeed, no individual is actually ever identified by Plaintiff, and no evidence whatsoever that the alleged remarks were related to the decision to terminate Plaintiff.  In his *Opposition*, Plaintiff utterly ignores the stray remarks doctrine and fails to offer any arguments or supporting evidence in rebuttal.

4.    <u>Same Actor Inference</u>

GP also contends it is entitled to the same actor inference because Hill, who hired and made the decision to fire Plaintiff, is in the same protected class as Plaintiff.  On several occasions, the Fifth Circuit has held "that discrimination is less likely when the supervisor is in the same protected class as the plaintiff."[124]  In *Jones v. Wells Fargo Bank, N.A.*, the district court for the Eastern District of Louisiana explained:

> "While evidence of [same actor] circumstances is relevant in determining whether discrimination occurred," the Fifth Circuit has "decline[d] to establish a rule that no inference of discrimination could arise under such circumstances." *Haun v. Ideal Indust., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996). In other words, the same actor inference is neither mandatory nor irrebuttable. Nevertheless, where, as here, the non-moving party has otherwise failed to raise a genuine dispute as to a material fact, the same actor inference simply reinforces the defendant's submission with respect to Jones's age and race discrimination claims.[125]

While the inference is not irrebuttable, Plaintiff fails to address or rebut the same actor inference in this case.  Plaintiff has presented no summary judgment evidence contradicting the fact that Hill made the decision to hire and fire Plaintiff or that Hill is in

---

[124] *McMichael v. Transocean Offshore Deepwater Drilling, Incorporated*, 934 F.3d 447, 460 (5th Cir. 2019)(citing *Kelly v. Costco Wholesale Corp.*, 632 F. App'x 779, 783 (5th Cir. 2015) ("[The plaintiff's] membership in the same protected class as [the supervisor] bolsters the inference that age discrimination was not the reason for his termination."); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), *abrogated on other grounds by Reeves*, 530 U.S. at 134, 120 S.Ct. 2097 (holding that, since the 58-year-old plaintiff was fired by his 60-year-old employer, there was an inference that "age discrimination was not the motive")).

[125] 2019 WL 4601602 at *12 (E.D. La. Sep. 23, 2019).

50547

the same protected class as Plaintiff.  Notably, in response to Plaintiff's reports to Hill of race discrimination on behalf of his safety team, Plaintiff testified that Hill responded that there was no place for such behavior at GP.[126] Thus, GP is entitled to the same actor inference, which mitigates against a finding of pretext in this matter.

        5.    Plaintiff's Testimony

        Finally, Plaintiff's own, sworn deposition testimony belies his current argument that he was fired because of his race.  In opposition to GP's motion, Plaintiff ignores his deposition testimony acknowledging his belief that he was fired for reasons other than his race.  During his deposition, Plaintiff testified that Hill did not terminate him because of his race but because Plaintiff was trying to change the safety culture at the mill[127] and that he believed he was suspended so he would be kept out of the mill during the outage and ultimately terminated because he was just doing his job as safety manager.[128]  The Court has not been directed to any evidence suggesting that Plaintiff, himself, believed he was terminated because of his race.  Counsel's arguments are not evidence and cannot carry Plaintiff's burden on summary judgment.  It is axiomatic that "[a]rguments by counsel in a brief do not constitute summary judgment evidence[.]"[129]  Indeed, it is "well established that arguments set forth in a brief in response to a motion for summary judgment, unsupported by ... adequate summary judgment evidence, are insufficient to

---

[126] Rec. Doc. No. 54-3, Irving Depo., Vol. 2 at 112:15-21.
[127] Rec. Doc. No. 54-2, Irving Depo., Vol. 1 at 105:5-17.
[128] *Id.* at 103:23-104:5, 105:5-8, 142:10-13; Rec. Doc. No. 54-3, Irving Depo., Vol. 2 at 59:19-60:20.
[129] *Clark v. RailCrew Xpress, L.L.C.*, 2018 WL 5269365 at *5 (M.D. La. Oct. 23, 2018).
50547

raise genuine issue of material fact to defeat a properly supported motion for summary judgment."[130]

Accordingly, Plaintiff has failed to demonstrate by competent summary judgment evidence the existence of genuinely disputed material facts as to his race discrimination claim, and summary judgment is proper in favor of GP on this claim.

### C.    Title VII Retaliation

Plaintiff also contends his termination was in retaliation for reporting discrimination in the workplace on behalf of himself and others.  To establish a *prima facie* case of retaliation under the traditional *McDonnell Douglas* framework, "the plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action."[131]  An employee engages in activity protected by Title VII when the employee has "opposed any practice made an unlawful employment practice" by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[132]

If the plaintiff establishes a *prima facie* case, then the employer has the burden of production to provide "a legitimate, non-discriminatory reason" for the adverse employment action.[133]  If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual.[134]  "A plaintiff may establish pretext by

---

[130] *Hockaday v. Tx. Dep't of Criminal Justice*, 914 F. Supp. 1439, 1446 (S.D. Tex. 1996).
[131] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).
[132] 42 U.S.C. § 2000e–3(a); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).
[133] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).
[134] *Id.*
50547

showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence."[135]  Ultimately, in order to survive a motion for summary judgment, a plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the employer would not have taken the adverse employment action but for the protected activity.[136]

Plaintiff maintains that he was fired in retaliation for engaging in the following protected activities:  (1) participating in several Occupational Safety and Health Administration ("OSHA") investigations of accidents and compliance issues; (2) complaining of racial discrimination on behalf of himself and his safety team; and (3) reporting an instance of alleged sexual harassment between his direct report and his supervisor.  Plaintiff's OSHA activity cannot form the basis of his Title VII retaliation claim because the law is clear that Title VII does not encompass OSHA violations or internal safety complaints.  The court in *Riggs v. DXP Enterprises, Inc.*[137] aptly explained:

> Title VII does not encompass OSHA violations. *See* 42 U.S.C. § 2000e-2(a). Indeed, courts evaluating retaliation claims based on facts similar to those in the instant case have consistently held that an employee who has reported OSHA violations has not engaged in statutorily protected activity under Title VII. *See Washington v. M. Hanna Constr., Inc.*, 299 Fed. App'x. 399, 401 (5th Cir. 2008) ("Because Title VII does not encompass violations of OSHA ... Plaintiff's alleged reporting of [defendant] to authorities for violating OSHA does not qualify as protected activity under Title VII."); *Langford v. Magnolia Adv. Materials, Inc.*, No. 15-1115, 2017 WL 5203048, at *15 (N.D. Ga. Jan. 3, 2017) (holding that plaintiff could not establish a prima facie case of retaliation because his complaint with OSHA for unsafe

---

[135] *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013).
[136] *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)).
[137] 2019 WL 5682897 (W.D. La. Oct. 31, 2019).
50547

working conditions was not protected activity under Title VII); *Dixon v. Primary Health Servs. Ctr.*, No. 10-1490, 2012 WL 1566279 (W.D. La. May 1, 2012) (granting summary judgment, finding that plaintiff failed to establish a prima facie case of retaliation because participation in an OSHA proceeding is not protected activity under Title VII).

Nor do internal safety complaints constitute protected activity under Title VII. *See Green v. Trimac Transp. South Inc.*, No. 10-444, 2012 WL 12893293, at *16 (E.D. Tex. Sept. 12, 2012) (granting summary judgment on plaintiff's retaliation claim based on allegation that plaintiff was discharged in retaliation for safety complaints on the ground that complaining of an employer's safety violations is not a protected activity under Title VII); *Mayers v. Shaw Indus.*, No. 09-2635, 2010 WL 5158418, at *4 (D.S.C. Nov. 23, 2010) (dismissing plaintiff's retaliation claim premised on reporting alleged safety violations on the ground that he did not engage in activity protected by Title VII); *Acosta v. City of Phoenix*, No. 05-1810, 2006 WL 3499963, at *11 (D. Ariz. Dec. 4, 2006) (holding that plaintiff failed to establish a prima facie case of Title VII retaliation based on his complaints of employer's alleged violation of federal environmental laws and state safety regulations).[138]

Thus, the only Title VII protected activity Plaintiff engaged in is the reporting of race discrimination and the report of sexual harassment on behalf of his direct report.

Assuming *arguendo* that Plaintiff meets the temporal proximity test and, thus, presents a *prima facie* case of retaliation as to the protected activity, Plaintiff finds himself in the same fruitless attempt to demonstrate pretext as discussed above,[139] this time under application of the higher, "but-for" causation standard.  For his retaliation claim, Plaintiff's protected activity must be *the* reason for Plaintiff's termination, not merely one of the reasons.  Again, Plaintiff's own deposition testimony undermines the viability of this claim.  As set forth above, Plaintiff testified repeatedly that he believed his termination

---

[138] *Id.* at *5-*6.
[139] Plaintiff has already conceded that, for purposes of this motion, GP has presented a legitimate, non-discriminatory reason for Plaintiff's termination.

50547

was driven by his attempts to change the safety culture at GP and "for just doing his job" as safety manager. Plaintiff has not directed the Court to any summary judgment evidence whatsoever to demonstrate that GP's decision to terminate Plaintiff was pretextual, or false or unworthy of credence. Finding that no reasonable jury could conclude that Plaintiff was terminated in retaliation for opposing or complaining about discrimination in the workplace, GP is entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the *Motion for Summary Judgment*[140] by GP is GRANTED. Plaintiff's claims are dismissed with prejudice.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED**.

Baton Rouge, Louisiana, this 15th day of June, 2021.

_Shelly D. Dick_
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[140] Rec. Doc. No. 54.

50547